UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Shaun Thompson,
        Plaintiff

        v.                                    Case No. 19-cv-513-SM
                                              Opinion No. 2021 DNH 145

Paul G. White Tile Company, Inc.,
        Defendant


**O R D E R**


Shaun Thompson brings this action against his former employer, Paul G. White Tile Company ("WTC"), seeking damages for wrongful termination and unlawful refusal to pay wages earned.  After its motion to dismiss was denied, WTC answered and asserted counterclaims against Thompson, alleging fraud and tortious interference with contractual relations.  Pending before the court are the parties' cross motions for partial summary judgment.  Thompson seeks judgment on his former employer's counterclaims, while WTC seeks the same with respect to Thompson's claims for wrongful termination and failure to pay wages.  For the reasons discussed, Thompson's motion for partial summary judgment is granted, and WTC's motion for partial summary judgment is denied.

**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).  When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact."  Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014).  In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment."  Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52

(1st Cir. 2014).  <u>See generally</u> <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 249 (1986).

## Background

Some material facts are disputed, but the basic factual
background is as follows.  WTC is a flooring and tile
installation company with a principal place of business in
Maine.  It also has an office in Newmarket, New Hampshire.  In
August of 2016, WTC hired the plaintiff, Shaun Thompson, to
manage its New Hampshire operation.  Before that, Thompson had
owned and operated his own flooring company in Massachusetts.

Thompson testified that, as part of his transition to WTC,
he explained that he would have to wind down his business – that
is, honor existing commitments he had made to his customers and
complete those projects that could not be migrated to WTC.  The
parties agreed that Thompson would be paid a base salary of
$185,000 per year, plus an annual commission amounting to ten
percent (10%) of the company's profits.  The parties disagree
about the details involved in calculating those commissions.
According to Thompson's calculations, he is owed (and WTC has
refused to pay him) more than $300,000 in earned commissions.

During Thompson's tenure with WTC, the company hired Paul
Phillips as a project manager in Thompson's division.  Phillips
owned a flooring and carpet installation business in
Massachusetts called "Paul's Carpet."  Thompson had known
Phillips for several years and had employed him as a
subcontractor for some of the projects Thompson had undertaken
while running his own business.  WTC believes that Phillips,
while employed by WTC, directed work away from WTC and to his
own flooring business, which he continued to operate on the
side.  WTC also claims that Thompson was aware of Phillips'
conduct and actively facilitated it.

WTC says its New Hampshire division lost money in both 2017
and 2018.  See Defendant's Memorandum (document no. 58) at 5.
Thompson disputes that claim.  He says he increased the New
Hampshire division's sales (the metric on which his commissions
were to be based) substantially in both 2017 and 2018 – by
hundreds of thousands or even millions of dollars.  And, says
Thompson, he was entitled to a commission at the end of 2017 of
roughly $206,000.  Instead, WTC paid him a "bonus" of $20,000.
He claims to have repeatedly raised the issue of commissions
owed to him with WTC's owners, Jonathan White and his brother,
Paul White.  Thompson also says that during a meeting on March
5, 2018, Jonathan White assured him that he would be "made

whole" by the end of 2018.  Thompson says that although he

considered resigning, he continued to work for WTC based upon

Jonathan's representation that he would receive all commissions

to which he was entitled within the next ten months.  He

received no commissions in 2018 (or thereafter).

Paul White fired Thompson on Saturday, December 29, 2018.

WTC says Thompson's employment was terminated because he lied to

Paul White about whether and/or how long he planned to be at

work the day before.  WTC recounts the events that prompted

Thompson's discharge as follows:

> Representing that he would be working Friday, December
> 28, 2018 and going to his daughter's sports tournament
> in Syracuse, New York the following day (Saturday),
> [WTC] management learned instead that Thompson skipped
> work Friday and was speeding on his way to Syracuse in
> his company truck.

Defendant's Answers to Plaintiff's First Set of Interrogatories

(document no. 56-12) at 5 (emphasis supplied).  According to

WTC, when Paul discovered that Thompson failed to go to work on

Friday and, instead, departed on a personal trip to Syracuse, he

decided to fire Thompson.  See Defendant's Amended Memorandum in

Support of Summary Judgment (document no. 58) at 12 ("Thompson

misled his manager, Paul White, about his availability and when

he would be traveling to Syracuse.  Mr. White was entitled to

react by terminating Thompson for his lack of truthfulness
. . . . As already established, the December 29 termination
flowed from a misrepresentation."). <u>See also</u> Deposition of Paul
White (document no. 56-4) at 57 (testifying that because
Thompson lied to him about such a minor thing, White no longer
trusted him and decided to fire him).

Thompson asserts that WTC's proffered explanation – his
alleged failure to go to work on Friday and early departure for
Syracuse - is not only based upon a misstatement of the facts,
but is also a pretext for his unlawful discharge, which was in
fact retaliation for his insistence upon being paid the
commissions he had earned.

All agree that WTC's New Hampshire office closed at 2:00
p.m. that Friday for an extended holiday weekend.  Thompson
testified that he made clear to Paul White earlier in the week
that he intended to work on Friday morning, but would be leaving
early to begin a family trip to Syracuse.  White raised no
objection.  <u>See</u> Thompson Deposition (document no. 56-6) at 265-
66.  GPS data from Thompson's company-issued vehicle is
consistent with Thompson's testimony.  That data reveals that,
contrary to WTC's claim, Thompson <u>did</u> go to the office on Friday
and arrived at approximately 8:03 a.m.  He then visited one of

WTC's job sites in southern New Hampshire, before departing for
Syracuse approximately three hours later, at 10:54 a.m.  See GPS
Activity Report (document no. 56-13) at 2-4.  See also Thompson
Deposition (document no. 56-6) at 266-67.


     Thompson claims he was discharged not because he failed to
go to work (or left work early) on that Friday, but in
retaliation for having repeatedly questioned WTC's owners (Paul
and Jonathan) about the company's failure to pay his
commissions, as well as disputes about how those commissions
would be calculated.  Moreover, says Thompson, the timing of his
termination – at the very end of December – was meant to allow
WTC to claim (as it does) that he is not entitled to any
commissions for the entire year of 2018.


     WTC denies that it engaged in any wrongful conduct or that
it owes Thompson any unpaid wages or commissions.  Indeed, says
WTC, Thompson was a dreadful employee and is liable to it for
both fraud and tortious interference with contractual relations.
According to WTC, Thompson diverted significant work away from
WTC and to another employee of WTC (Paul Phillips), whom WTC
claims was defrauding it by operating a competing flooring
business on the side, without its knowledge.  WTC's
counterclaims also make various other assertions about allegedly

wrongful conduct on Thompson's part, including claims that he
improperly used his company credit card, improperly used his
company vehicle, and lied about the prospects of landing new
customers.  According to WTC, had it known the full scope of
Thompson's alleged wrongdoing earlier, it would have terminated
his employment as early as 2016.  Thus, says WTC, it is not
obligated to pay Thompson any of the promised commissions for
2018.

## Discussion

I.   <u>Thompson's Motion for Partial Summary Judgment</u>.

As noted, WTC asserts two counterclaims against Thompson:
fraud and tortious interference with contractual relations.
Thompson moves for summary judgment on both counterclaims,
asserting that there are no genuinely disputed material facts
and saying he is entitled to judgment as a matter of law.

A.   WTC's Counterclaim for Fraud.

To prevail on its fraud claim, WTC must demonstrate: (a)
that Thompson misrepresented a material fact to WTC; (b) with
knowledge of its falsity or a conscious indifference to its
truth or falsity; (c) with the intention that WTC rely upon that
representation; and (d) that WTC did, in fact, justifiably rely
to its detriment on that representation.  See <u>Snierson v.</u>

Scruton, 145 N.H. 73, 77 (2000).  Although WTC advances a broad-ranging attack against Thompson and points to many examples of his allegedly poor performance as an employee, see Defendant's Memorandum (document no. 57-1) at 14-15, its plausible allegations related to fraud are confined to the following.[1]

**The Winding-up of Thompson's Former Business**.  WTC alleges that, "Thompson informed [WTC] that his personal business had been closed.  Yet, he continued to operate it at least through December 2016 while employed by PWT."  Defendant's Memorandum (document no. 57-1) at 15.  That, says WTC, amounted to fraud (though it fails to explain how it relied upon that alleged misstatement to its detriment or how it was harmed by such reliance).

In response, Thompson testified that, prior to accepting employment with WTC in August of 2016, he informed both Jonathan and Paul White that he would need a few months to wind up and close his personal flooring business.  Thompson Affidavit (document no. 45-2) at para. 6.  Nothing pled and nothing in the

---

[1]    WTC's other allegations of fraud are without merit and do not warrant discussion.  They are more than adequately addressed, and refuted, in Thompson's various legal memoranda.

record suggests Thompson did anything other than that.  Along

those lines, Thompson testified at his deposition as follows:

> **Question:**  And how do you know that Paul White was
> aware that you were managing a job for Elaine Ryan at
> Whittier Health in the end of August of 2016 [the
> month during which WTC hired Thompson]?
>
> **Answer:**  Because it was communicated, and in our
> business it happens all the time.  We can't just stop
> the projects that are in motion.  Projects have been
> worked on for 12 months in advance and there's
> material that's been ordered.  The sales process is a
> long process.  There's projects with Elaine that start
> in January that don't go until the following year.  I
> was under obligation in contract to finish those
> projects.  Those projects could not be transferred to
> Paul White Tile, and everything was made clear to Paul
> and Jonathan that, it was very informal conversation
> of, yeah, we know, you've got to finish what you
> started, period.
>
> **Question:**  And when did you have those conversations?
>
> **Answer:** Prior to coming on board full time.

Thompson Deposition (document no. 56-6) at 94-95.

Thompson has also submitted tax records showing that his

business was closed during the years 2017 and 2018, while he was

employed by WTC.  That evidence is undisputed and tends to

establish that Thompson completed the wind-up of his personal

business before the beginning of the 2017 tax year – that is,

within a few months of starting his employment with WTC.  WTC

has pointed to no record evidence undermining that asserted

fact.  Indeed, that WTC retained Thompson as an employee for

another two years is consistent with Thompson's assertion that
the work associated with winding up his personal business was
acceptable to WTC, did not interfere with his work at WTC, and
did not harm WTC in any tangible way.

    The precise nature of WTC's fraud claims as they relate to
Thompson's efforts to wind up his personal business are vague
and unclear – perhaps intentionally so.  See, e.g., Defendant's
Memorandum (document no. 57-1) at 2-3.  See also Answer,
Affirmative Defenses and Counterclaims (document no. 9) at 8.
See generally Snierson, 145 N.H. at 77 ("A plaintiff cannot
allege fraud in general terms, but must specifically allege the
essential details of the fraud and the facts of the defendants'
fraudulent conduct.").  What is clear, however, is that WTC has
not pointed to record evidence that supports its assertion that
the winding-up of Thompson's business somehow amounted to
"fraud."  That is to say, WTC has not shown a factual basis for
asserting each of the essential elements of a viable fraud claim
as it relates to allegations surrounding the winding up of
Thompson's company.

    **"Suspect" Holiday Liquor Purchase.**  WTC also asserts that
Thompson used his company credit card to purchase approximately
$600 worth of liquor which (according to WTC) Thompson falsely

11

claimed he distributed to customers as holiday gifts but, instead, kept for himself for use at a "personal holiday party." Answer, Affirmative Defenses and Counterclaims (document no. 9) at 7.   Initially, Paul White claimed he reviewed the GPS tracking records from Thompson's company vehicle and said they demonstrated that Thompson made "no such visits" to WTC's customers.   Email from Paul White to Counsel for Thompson (document no. 57-7) at 1.   White demanded immediate repayment of $595.63, the full amount that Thompson claimed as corporate expense.   Id.   The assertion that Thompson made none of the claimed holiday gift deliveries, essentially stole the liquor, and then used it for a "personal holiday party" was reiterated with equal confidence in WTC's Answer, Affirmative Defenses and Counterclaims (document no. 9) at 7, as well as its Answers to Interrogatories (document no. 56-12, at 5).   That assertion has, however, since been largely refuted by the actual GPS data from Thompson's vehicle and Thompson's unrebutted testimony.   See Thompson Affidavit (document no. 45-2).[2]

---

[2]   The GPS data Paul White says he "downloaded as a CSV (spreadsheet) file" and upon which he claims to have relied in making various accusations against Thompson, see Affidavit of Paul White (document no. 57-4) at paras. 20-21, is incomplete and inconsistent with the GPS data file WTC disclosed during discovery.   Compare Exhibit D to Affidavit of Paul White (document no. 63-2) at 15 with GPS Data produced during discovery (document no. 45-2) at 10-27.

WTC has now tempered its claims and says Thompson failed to make deliveries to two of the companies to which he allegedly said he had given holiday gifts: "PC Construction Company" and "Martini Northern LLC."  See Defendant's Objection (document no. 57-1) at 10-11.  In support of that claim, WTC has submitted a handwritten note that consists exclusively of the names of eleven companies – it is untitled, unsigned, and bears no date. See Handwritten Document (document no. 57-7) at 3; see also Thompson Deposition (document no. 49-1) at 131.  Included on that list are the names of two companies: "Martini Northern" and "PC Washington Mills" (presumably, the latter is the company WTC references as "PC Construction Company").  As evidence of Thompson's "fraud," WTC has presented affidavits from officers of those two companies, testifying that they never received holiday gifts from Thompson in 2018.

In response, Thompson filed an affidavit in which he testifies to the following:

> [WTC] has alleged that in December of 2018, I charged
> $585.63 [sic] in liquor to my company credit card to
> have a holiday party at my home.  This is entirely
> fabricated.  I purchased liquor for the purpose of
> providing gifts to customers, with [WTC's] approval.
> I did the same thing in 2017.  I also handed out Lindt
> Chocolates.  After dropping off the gifts to
> customers, I provided the leftover bottles to
> employees of the New Hampshire Division of [WTC].

GPS data regarding my Paul White Tile Co., Inc.
company vehicle, produced by the Defendant, is
enclosed herewith.  The data contains highlights
depicting that I dropped off liquor gifts on the
following dates and times to the following customers:

- 12/20/18, 12:36pm, KJ Maul Construction in
  Johnston, RI.
- 12/20/18, 2:33pm, Dacon Corporation in Natick, MA
- 12/21/18, 9:40am, Bonnet Page and Stone in
  Laconia, NH
- 12/21/18, 11:37am, AHO Construction in New
  Ipswich, NH
- 12/21/18, 12:14pm, Fulcrum Construction in
  Amherst, NH
- 12/21/18, 12:38pm, EEI Services in Merrimack, NH
- 12/21/18, 2:24pm, North & South Construction in
  Barrington, NH
- 12/21/18, 2:51pm, Lecesse Construction at job
  trailer for RiverWoods on Stone Quarry
  Drive in Durham, NH
- 12/21/18, 3:16pm, 2 International in Newington,
  NH
- 12/21/18, 3:41pm, Berkley Building Company in
  Portsmouth, NH

Affidavit of Shaun Thompson (document no. 45-2) at paras.
20-21.


Thompson's affidavit and the supporting GPS data are
unrebutted and, therefore, establish that: Thompson dropped
off holiday gifts of liquor to ten customers of WTC between
December 20 and 21, 2018; he left the undistributed bottles
of liquor with his staff at the New Hampshire office; and
he kept none for himself.  His request for reimbursement
from WTC for the expenses associated with those gifts was,

14

then, entirely appropriate.  For its part, WTC has failed

to explain how Thompson's alleged failure to deliver gifts

to two companies on the list was a knowing, intentional,

material representation upon which it relied to its

detriment.  In other words, WTC has failed to show how

Thompson's inclusion of "Martini Northern" and "PC

Washington Mills" on the list, whether inadvertent or

intentional, constitutes fraud.  Nor has it pointed to any

genuinely disputed material facts which, if credited in

WTC's favor, would allow a properly instructed jury to

conclude that Thompson committed fraud by lying about his

purchase of holiday gifts for customers of the company and

then seeking corporate reimbursement for what was actually

a personal expense.


     **Representations About "Probable" Contracts.**  As the

Division Manager of WTC's New Hampshire operations, Thompson was

responsible for overseeing the division's sales, operations, and

projects.  "Project Managers" were responsible for maintaining

day-to-day communications with customers, preparing bids for

potential projects, making sales, and closing contracts before

turning those projects over to the operations side of the

business.  See, e.g., Deposition of Paul White (document no. 45-

5) at 12.  Thus, says Thompson, he "relied on project managers

15

for information relating to the status of prospective projects,
including whether or not [WTC] was likely to win a contract."
Affidavit of Shaun Thompson (document no. 45-2) at para. 9.

Nevertheless, WTC claims that Thompson lied about the
possibility of several large customers signing contracts with
the company.  According to WTC, Thompson knowingly and falsely
represented that seventeen potential clients were "90 to 100
percent" certain to sign contracts with WTC and WTC relied to
its detriment on those (knowingly false) representations.  See,
e.g., Deposition of Paul White (document no. 57-13) at 78.  In
the end, however, only a few of those potential customers
actually engaged WTC to perform work for them.

At the center of that dispute is an email Thompson
forwarded to Paul and Jonathan White, with an attachment that
appears to have been prepared by one of WTC's project managers.
See Email from Thompson dated July 24, 2018 (document no. 45-8).
But, neither Thompson's email nor the attached document make any
representations about the likelihood that a particular entity
would actually sign a contract with WTC.  Instead, the attached
document identifies seventeen possible clients, states the
dollar amount of any potential contract, includes a brief
description of the work under consideration, and includes a

16

comment section with notations like "waiting on decision" and
"in negotiations" and "budget stage."  It does not make any
representations of the sort suggested by WTC and certainly does
not support the claim that Thompson knowingly and falsely
represented (and WTC reasonably relied upon the representation)
that the seventeen potential clients listed were "90 to 100
percent" certain to enter contracts with WTC.  Indeed, WTC's
claimed detrimental reliance on that document to support its
assertion that Thompson engaged in fraud is, as best,
questionable.

     Moreover, even if there were evidence that Thompson had
represented that he believed one or more clients were "90 to 100
percent" certain to sign a contract with WTC, there is no
evidence that he knew such a representation was false (or that
he was consciously indifferent to its falsity).  Such statements
would obviously constitute mere projections or opinions about
potential sales – hardly the stuff of actionable
misrepresentations.  Nor is there evidence that a large and
successful corporation like WTC, with significant annual
revenues, would ever reasonably rely to its detriment upon such
an assurance.  Surely such a company, presumably run by
sophisticated business people, would only count a potential

customer as an actual customer <u>after</u> it had executed a binding contract.

WTC's fraud claims as they relate to the Thompson's alleged misrepresentations about potential clients are without merit.

**Diversion of "A High Value Lead" to Another Company.**  Next, WTC alleges that:

> One of the businesses with whom Thompson had a relationship when he was running his own operation was John Christensen of Bolcor.  Thompson maintained this relationship even after starting work for [WTC]. Thompson Dep. 21:18 to 21:22.
>
> In September 2016 a corporate manufacturer's rep, speaking highly of his relationship with [WTC], suggested that an out-of-state end-user from Nashville, Tennessee working on a Portland Maine project reach out to Shaun Thompson at [WTC]. <u>Thompson took this lead and instead sent it to Christensen</u>.  Thompson Dep. 173:19 to 174:23 and Thompson Dep. Ex. 41.

Defendant's Memorandum (document no. 58) at 6 (emphasis supplied).

Again, however, WTC does little to explain how that conduct gives rise to a viable fraud claim – that is, how each of the essential elements of fraud have been articulated and supported by record evidence (or even genuinely disputed factual claims).

Thompson, on the other hand, gives a bit more context to WTC's vague allegations.

> [WTC] also falsely claimed that I diverted a business lead from [WTC] to Bolcor in September of 2016.  When I received an email on the job in question, I brought it to Paul White's attention.  He rejected it because it was labor only.  I therefore forwarded the job to John Christensen of Bolcor, who was a subcontractor I knew and we used at [WTC].  I forwarded the job openly, using my [WTC] email, as depicted at Exhibit 29.

Thompson Affidavit (document no. 56-2) at para. 31.  See also Plaintiff's Memorandum (document no. 56-1) at 21-21.

Thompson's testimony on this point is unrebutted.  He presented the potential work to Paul White, who rejected it because it was a "labor only" job.  Paul White's indefinite testimony on this issue, see Affidavit of Paul White (document no. 46-2), at paras. 7-8, does not give rise to any genuine dispute about material facts (nor does it explain how Thompson's conduct – even as described by WTC – amounted to fraud).

**Misuse of Company-supplied Vehicle.**  Next, WTC claims that Thompson misused his company-issued vehicle by driving it too often for personal use, and then committed fraud by failing to disclose the extent of that personal use.  See Answer, Affirmative Defenses and Counterclaims (document no. 9) at 6

19

("Thompson was provided by [WTC] with a company vehicle for business use.  Thompson was advised by [WTC] and understood that the company vehicle was to be used for business purposes.  On information and belief, Thompson used his [WTC] company vehicle extensively for personal trips charging [WTC] for all costs of operation and tolls.").

That claim is undermined by the deposition testimony of Jonathan White.  Jonathan testified that he, not Paul, was responsible for making corporate decisions about company-issued vehicles during Thompson's tenure with WTC.  Deposition of Jonathan White (document no. 45-3) at 29.  Jonathan also testified that: (a) he provided Thompson with the company-owned truck; (b) he was unaware if anyone at WTC ever provided Thompson with a written policy regarding personal use of the vehicle; (c) he understood that Thompson would be using that truck as his primary vehicle for both work and personal purposes; (d) he was aware that Thompson used that vehicle as his primary "daily driver;" and, perhaps most importantly, (5) he had no issue with Thompson using the truck for non-work purposes.  Id. at 31-32.

For his part, Thompson testified that he did nothing to conceal his personal use of the company-issued truck and WTC was

(despite its current claims) fully aware of the uses to which he
put that vehicle.  Thompson also testified that he was aware
that the truck was equipped with a GPS tracking device, so his
use of that vehicle would be subject to constant monitoring of
both business and personal use.  And, at no point did anyone at
WTC raise any questions about his personal use of that vehicle.
See Affidavit of Shaun Thompson (document no. 45-2) at para. 14;
see also Deposition of Jonathan White at 30.


       Despite the foregoing, WTC asserts that Thompson
"defrauded" it by using his company-issued vehicle "too often"
for personal purposes and then failing to disclose that alleged
misuse of the vehicle to WTC:

> Thompson Dep. Ex. 29 reflects that of the 40,084 miles
> his Company vehicle was driven in 2018, 27,606 of
> these miles were for personal use. P. White Aff. ¶¶
> 20-21.  This is 69% of total use.  Had Paul White
> become aware of the extent of Thompson's personal use
> of his PWT supplied truck he would have immediately
> addressed this.  P. White Aff. ¶ 22.  When confronted
> with this document (Thompson Dep. Ex. 29), Thompson
> indicated he had no sense of how much personal use he
> made of his company supplied truck.  Thompson Dep.
> 152:19 to 153:1.

> Suggesting that he had used the truck similarly in
> 2016 and 2017 and was never confronted about it,
> Thompson agreed that neither did he tell Jonathan
> White that he was going to be using the Company
> vehicle 27,600 personal miles per year.  Thompson
> 153:9-21.

> Jonathan White was responsible for managing company
> supplied vehicles.  J. White Dep. 29:1-3.  <u>Contrary to
> the assertion at Thompson Aff. ¶ 13</u>, Thompson never
> informed Jonathan White about the magnitude of the
> personal use of the truck furnished Thompson for
> business purposes.  J. White Aff. ¶¶ 4-9.

Defendant's Memorandum in Opposition to Summary Judgment

(document no. 57-1) at 9 (emphasis supplied).

        Parenthetically, the court notes that, notwithstanding

WTC's representation, there is nothing to the "contrary" (or

even controversial) in paragraph 13 of Thompson's affidavit.

WTC falsely suggests that Thompson testified that he "informed

Jonathan White about the magnitude of [his] personal use of the

truck."  He gave no such testimony.  Rather, Thompson testified

that, "As a benefit to my employment, [WTC] provided me with a

company vehicle.  Jonathan White provided the vehicle to me.  I

told Jonathan White that I intended to use it as my primary

vehicle for both work and personal purposes.  Jonathan gave me

permission to use if for personal purposes.  Because I had

permission to use it for personal purposes, I did not maintain

my own personal vehicle."  Thompson Affidavit (document no. 45-

2) at para. 13.  Those assertions are consistent with Jonathan

White's deposition testimony.  <u>See</u> Deposition of Jonathan White

(document no. 45-3) at 29-32.  It also probably bears noting –

even though it is not critical in any respect - that Thompson

disputes Paul White's claim that he drove the vehicle for 27,606 miles of personal use in 2018 - an estimate based solely upon White's claimed review of the vehicle's GPS data and his assumptions about which travel might legitimately relate to the business and which may have been personal in nature.  See Affidavit of Paul White (document no. 57-4) at para. 21. Moreover, as noted above (and discussed more fully below), the GPS data upon which Paul White says he relied appears to have been inaccurate.

All of that is interesting, but beside the point.  Even if WTC could persuade a jury that its factual claims are true (despite Thompson's and Jonathan White's testimony to the contrary, as well as legitimate questions about whether WTC has manipulated the GPS data[3]), those claims are simply insufficient to sustain a cause of action for fraud.  WTC has failed to point

---

[3]    According to Thompson, at his deposition, counsel for WTC presented him with "doctored" GPS records of his use of the company-issued truck, in an effort to demonstrate that he never went into the office of December 28, 2018 (the day before he was fired).  In fact, it appears Thompson did go to the office that day and the GPS records with which counsel confronted him seem to have been, for lack of a better word at the moment, "incomplete."  See Thompson Deposition (document no. 56-6) at 268; compare Exhibit 29 to Thompson Deposition (document no. 56-14) at 3 (the so-called "doctored" GPS data) with GPS Activity Report (document no. 56-13) at 2-4 (showing that, as Thompson testified, he did go to the office that day and then drove materials to a WTC project site in Windham, New Hampshire, before departing for Syracuse).

to any false statements uttered by Thompson upon which it justifiably and detrimentally relied. Nor has it shown that Thompson had any obligation to use the truck exclusively (or even primarily) for business purposes.

Not only has WTC failed to offer factual support for its allegations of fraud, but Thompson has raised legitimate questions about WTC's possible alteration of evidence (including the GPS tracking information linked to Thompson's vehicle, discussed above; copies of board meeting minutes provided during discovery; and an email turned over during discovery), as well as its potential outright fabrication of evidence. Although the court need not belabor the point at this time (though an evidentiary hearing may be appropriate at a later date), one example is illustrative of WTC's potential misconduct.

Late in the discovery process, and presumably in support of its claim that Thompson misused his company-issued vehicle, WTC produced a document entitled "Personal Use of Company Vehicles Policy." Among other things, that document provides that, "It is the policy of this company that the company vehicles provided for employees be used only for company business" and "the company will consider any unauthorized use of vehicles as the equivalent of theft." Personal Use of Company Vehicles Policy

24

(document no. 56-16) at 2 (emphasis supplied).  The evidentiary
value of such a document to WTC's otherwise unsupported fraud
claim is both significant and self-evident.

That document appears to bear Thompson's signature and
suggests it was signed on his first day of work with WTC.  But,
upon receiving that document, Thompson notified his counsel that
he had never seen it before and certainly never signed the
photocopy produced in discovery.

As discussed earlier, Jonathan White testified that he was
the person at WTC who was responsible for overseeing employees'
use of company vehicles.  Yet, he testified that he was unaware
of Thompson having ever been given a written policy regarding
his use of the company vehicle.  Deposition of Jonathan White
(document no. 45-3) at 32.  And, despite Jonathan's role in
overseeing the use of corporate vehicles, it was Paul White who
claimed to have discovered the vehicle use policy document.  So,
shortly after WTC produced that document, Paul White's
deposition was reopened.  White was, however, unable to explain
why the document was disclosed late in discovery, nor could he
provide details about how, when, or precisely where it was
discovered – other than his general recollection that it was in
the "truck file," likely somewhere in the "accounting/human

resources department." See Continuation of Deposition of Paul
White (document no. 45-9) at 6-9.  He could not recall who had
drafted the document.  Id. at 5.  In fact, he could not remember
ever having seen the document before.  Id. 10.

By way of explanation, Paul White suggested that he was not
familiar with the document and could not testify in detail about
it because it was an "HR document" and he doesn't "handle the
truck file or the HR files."  Id. at 7 and 9.  Yet, the head of
WTC's human resources department testified that she was not
aware of that document having been presented to, or signed by,
any other employee of WTC; it was not in Thompson's personnel
file; and it was not part of WTC's "standard new hire packet."
Deposition of Dawn Allen (document no. 56-20) at 80-81.  Indeed,
she testified that, until shortly before her deposition, she had
never seen that document before.  Id. at 81.

Those facts give rise to a reasonable suspicion about the
authenticity of the document.  But, because Thompson was
confident he had not signed it, he retained a handwriting
expert.  The expert's full report is part of the record but, in
short, it concludes that Thompson's signature on that document
is a forgery.  Specifically, the expert concluded that
Thompson's signature was copied from another document he signed

during his onboarding process and then "pasted" onto the so-called vehicle policy document.  See Document Examiner Letter of Opinion (document no. 56-19) at 3.  Perhaps most tellingly, when one signature is placed on top of the other, it is clear that they are identical.  See Id. at 7.[4]

Questions surrounding the authenticity of the "Personal Use of Company Vehicles Policy," as well as WTC's other potential misconduct during the course of this litigation, can be addressed and resolved at a later date.  At this point, it is sufficient to note that WTC has not pointed to any record support for its claims of fraud in that respect.  Thompson, on the other hand, has shown that there are no genuinely disputed material facts related to those claims and that they are, as a matter of law, without merit.

---

[4]    At the final pretrial conference held on September 8, 2021, counsel for WTC advised the court that the defendant has revised its position and now acknowledges that Thompson's signature was, indeed, "cut and pasted."  But, says WTC, either Thompson or his wife must have done it.  Counsel also claimed that another copy of the "Personal Use of Company Vehicles Policy" had been discovered recently and was purportedly signed by a different employee.  Presumably, that late-discovered document has been provided to opposing counsel for examination and appropriate inquiry.

B.    WTC's Counterclaim for Tortious Interference.

To prevail on its claim that Thompson tortiously interfered with contractual relations, WTC must demonstrate that:

> (a) WTC had an economic relationship with a third party; (b) Thompson knew of that relationship; (c) Thompson intentionally and improperly interfered with that relationship; and (d) WTC was damaged by such interference.

See Hughes v. New Hampshire Div. of Aeronautics, 152 N.H. 30, 40-41 (2005) (citing Demetracopoulos v. Wilson, 138 N.H. 371, 373-74 (1994)).

In support of its tortious interference claim, WTC makes three assertions. First, it says Thompson diverted a "high value lead" away from WTC and to a competitor – Bolcor. The court addressed that claim earlier and that discussion need not be repeated. It is sufficient to note that Thompson's unrebutted testimony establishes that he presented that potential job to Paul White, but White passed on the work because he was not interested in "labor only" projects. WTC has failed to point to any evidence that might plausibly support a tortious interference claim with respect to that incident.

Next, WTC alleges that Thompson "allow[ed] Phillips or some other contractor to appropriate 14 of the 17 projects Thompson

28

listed and represented to Paul White were 90 to 100% certain."
Defendant's Memorandum (document no. 57-1) at 16.  And, finally,
WTC asserts that Thompson diverted potential business away from
WTC and to another WTC employee (Paul Phillips) who, according
to WTC, continued to run his personal flooring business while
employed by WTC.

**The "Loss" of Fourteen Potential Projects**.  The facts
relevant to this particular claim are discussed more thoroughly
above.  The court notes that WTC's tortious interference claim
rests on its assertion that Thompson "allowed" some other
contractor(s) to "appropriate" the 14 potential projects that
WTC did not land.  Defendant's Memorandum at 16.  But, to
prevail on a claim for tortious interference, WTC must show that
Thompson intentionally and improperly interfered with a business
relationship between WTC and a third party.  See Hughes, 152
N.H. at 40-41; see generally Tessier v. Rockefeller, 162 N.H.
324, 337 (2011).  It has not done so.  Nor has it pointed to any
genuinely disputed material facts that would preclude the entry
of judgment as a matter of law in favor of Thompson on that
claim.  Merely "allowing" a potential client to be lost to a
competitor – even if that is what Thompson actually did – hardly
constitutes intentional interference with contractual relations.

**Alleged Diversion of Work to Paul Phillips.** Finally, WTC alleges that Thompson surreptitiously directed potential clients away from WTC and to Paul Phillips. Although WTC claims Phillips acknowledged that he continued to operate his personal flooring business while employed with WTC, Phillips testified unequivocally that at no point during that time did Shaun Thompson ever divert potential business away from WTC and to him to be performed on the side. Deposition of Paul S. Phillips (document no. 45-6) at 178. In Jonathan White's deposition, when directly confronted with WTC's claim that Thompson improperly diverted work from WTC and to Paul Phillips, White testified as follows:

> **Question:** Do you believe that Shaun Thompson at any point diverted business from Paul White Tile Company to Paul Phillips?
>
> **Defense Counsel:** Objection. You can answer.
>
> **J. White:** I'm not sure.

Deposition of Jonathan White (document no. 45-3) at 97. Similarly, Paul White testified that he was aware of <u>no evidence</u> supporting the claim that Shaun Thompson improperly diverted business away from WTC and to Paul Phillips' private business.

> **Question:** So, there's been an allegation in this case that Shaun Thompson diverted business to Paul Phillips. Is that – do you believe that to be true?

**Answer:**   Well, there's two options there: One is he diverted the business and he was in on it, or he was unaware that Paul was executing the projects under his [Thompson's] nose.  Neither of them are acceptable as a divisional manager.  So it's either incompetent or corrupt.  Those are the two characteristics that I would – and neither of them are a very good option.

**Question:**  Do you have any evidence that Shaun Thompson diverted business to Paul Phillips?

**Answer:**  No, I don't have any direct evidence of that.

Deposition of Paul White (document no. 45-5) at 73-74.

In response to an interrogatory specifically seeking "any and all evidence that you have to support your contention that [Shaun Thompson] diverted business from [WTC] to Paul Phillips," WTC implicitly acknowledged it had none.  See Defendant's Answers to Interrogatories (document no. 45-14) at 9.  Instead, it reiterated Paul White's suggestion that there are two possible scenarios in which Thompson is equally culpable: one involving Thompson's active participation in the scheme and one in which Thompson, through lack of adequate oversight, was completely unaware of Phillips' (alleged) self-dealing: "Whether Thompson knew and participated in diverting business from [WTC] to Phillips or completely missed the fact that Phillips was still running his own business while collecting a weekly salary from [WTC], makes little difference.  Neither reflects

sufficient oversight by Thompson as was his responsibility."
Id. at 9 (emphasis supplied).

Of course, the distinction between active participation in
a fraudulent scheme, on one hand, and an indifferent failure to
notice such a scheme, on the other, does make a difference in a
claim against Thompson for having tortiously interfered with
WTC's contractual relations by knowingly and intentionally
diverting work to Phillips.  While WTC may (or may not) have
evidence suggesting that Paul Phillips continued to operate his
personal flooring business while employed by WTC, it has pointed
to no admissible evidence suggesting that Thompson participated
in, or was even aware of, that allegedly fraudulent scheme.

In short,  WTC has failed to show that there are any
genuinely disputed material facts that would preclude entry of
judgment as a matter of law in favor of Thompson on its tortious
interference claim.

II.  WTC's Motion for Partial Summary Judgment.

In response to evidence produced during discovery, Thompson
has withdrawn his claim that WTC failed to pay his full wages
during his final week of employment.  He continues, however, to
press his claim for commissions to which he was entitled, see

32

generally N.H. Rev. Stat. Ann. ("RSA") ch. 275, as well as his
claim that he was wrongfully terminated in retaliation for
having repeatedly pressed Paul and Jonathan White to pay those
commissions.  WTC moves for summary judgment as to both of those
claims.


A.   Thompson's Wage Claim.

     Thompson asserts that he is entitled to more than $300,000
in commissions, which WTC has refused to pay.  Thompson did not
receive any commissions for his work at WTC during 2016.  In
2017, WTC paid him what is calls a "bonus" in the amount of
$20,000 when, in fact, says Thompson, he was owed more than
$206,000 in commissions for that year.  And, finally, WTC
acknowledges that it did not pay Thompson any commissions for
2018, despite his having worked all but the last one or two days
of that year.  By way of explanation, WTC says that if its
principals had known the full extent of Thompson's (alleged)
misconduct earlier, they would have fired him before the start
of 2018.  Thus, says WTC, it is (or should be) legally excused
from paying Thompson any commissions otherwise earned in 2018.


     In addition to disagreeing about Thompson's entitlement to
commissions, the parties also dispute the means by which those
commissions were to be calculated (essentially, whether they

would be based upon "net" or "gross" profit).  Although Thompson

exchanged several emails with Paul and Jonathan White on this

topic, it appears to have been resolved orally.  See Thompson

Affidavit (document no. 56-2) at para. 4; see also Email chain

between Thompson and Paul White discussing employment and

compensation (document no. 56-7).  Plainly, then, there are

genuinely disputed material facts concerning both Thompson's

entitlement to commissions, as well as the formula to be used to

calculate those commissions.  Those are matters for the trier of

fact to resolve.  WTC is not entitled to judgment as a matter of

law as to Thompson's wage claim.


B.   Wrongful Termination.

To prevail on his claim that he was wrongfully terminated,

Thompson must demonstrate: first, that WTC was "motivated by bad

faith, malice, or retaliation in terminating [his] employment,"

Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 921 (1981)

(citing Monge v. Beebe Rubber Co., 114 N.H. 130, 133 (1974)),

and, second, that "he was discharged because he performed an act

that public policy would encourage, or refused to do something

that public policy would condemn."  Id. (citing Howard v. Dorr

Woolen Co., 120 N.H. 295, 297 (1980)).  With regard to the

second element, determining whether public policy was implicated

by a plaintiff's conduct is typically left to the jury.  See

34

Cloutier, 121 N.H. at 924 ("The existence of a 'public policy'
calls for the type of multifaceted balancing process that is
properly left to the jury in most instances."); see also Short
v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992) (noting that
"ordinarily the issue of whether a public policy exists is a
question for the jury," but acknowledging that "at times the
presence or absence of such a public policy is so clear that a
court may rule on its existence as a matter of law and take the
question away from the jury.") (citations omitted).

WTC asserts that Thompson's wrongful termination claim
fails because he was not fired in retaliation for having engaged
in conduct that public policy encourages.  Rather, says WTC,
Thompson was fired because he lied to Paul White about leaving
work early on the Friday prior to the New Year's holiday
weekend.  Moreover, says WTC, even if there was a dispute about
the wages and commissions owed to Thompson, "public policy does
not protect an 'employee's expression of disagreement with a
management decision.'"  Defendant's Memorandum (document no. 58)
at 14 (quoting MacKenzie v. Lineham, 158 N.H. 476, 481 (2009)).[5]

---

[5]    The so-called "management decision" WTC references is
apparently the one to withhold payment of Thompson's wages - a
bold and likely erroneous interpretation of New Hampshire law.

But, says Thompson, he was not fired merely because he questioned some "management decision," or the Whites' business judgment, or their managerial style or philosophy.  Instead, he says his employment was terminated in retaliation for his repeated inquiries into whether and when WTC would honor its contractual and statutory obligations to pay him wages to which he was legally entitled.  That is conduct undeniably protected by statute and New Hampshire public policy.  Indeed, state law expressly provides that "No employer shall discharge or in any other manner discriminate against any employee because he or she . . . inquired about, discussed, or disclosed his or her wages." RSA 275:38-a.  That, says Thompson, is precisely what occurred here.

Given the facts presented in this case, as well as the state of New Hampshire law, the court is not prepared to hold that, as a matter of law, a jury could not plausibly find that WTC retaliated against Thompson because he engaged in conduct supported by public policy.  To the contrary, it seems plain that should the jury credit Thompson's allegations, it could supportably and sustainably conclude that WTC terminated his employment in retaliation for his having engaged in conduct protected by both state law and public policy.

**Conclusion**

For the foregoing reasons, as well as those set forth in plaintiff's various legal memoranda, plaintiff's motion for partial summary judgment (**document no. 45**) is granted with respect to defendant's counterclaims, and defendant's motion for partial summary judgment (**document no. 46**) is denied.

As noted, the origins and authenticity of the written "Personal Use of Company Vehicles Policy," WTC's ongoing pursuit of claims for which it seemingly concedes it has no evidence, and the apparent alteration of GPS data presented to Thompson at his deposition, all raise serious doubts about the manner in which WTC has conducted this litigation.  Should the evidentiary record at trial warrant it, counsel should be prepared to address those matters at a hearing, to include whether attorney's fees, costs (including those associated with the handwriting expert), referrals, and/or other sanctions are appropriate under the circumstances.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 14, 2021

cc:  All counsel of record